UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF APPLE IPHONE MODEL A1522, IMEI 354390069331947, CURRENTLY LOCATED AT THE U.S. ATTORNEY'S OFFICE, 555 4TH STREET NW, WASHINGTON, D.C. 20530 | Misc. No. _____ |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Danielle K. Schnur, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—a digital device—which is currently in law enforcement possession, and the extraction from that property of electronically stored information as described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since June 2015.  I am currently assigned to investigations relating to, among other things, crimes against children, including the production, distribution, and receipt of child pornography, in violation of 18 U.S.C. Sections 2251, 2252, and 2252A. I have gained expertise in the conduct of such investigations through formal training and on-the-job training with more experienced agents. I have received training and experience in interviewing and interrogation techniques, arrest procedures, and a variety of other investigative tools available to law enforcement officers. I have received training and experience regarding analyzing wireless telephone cell site information, exploiting mobile communications and social media, obtaining and analyzing

digital records, and analyzing stored digital media, to include wireless telephones and computers. As a federal agent, I am authorized to investigate violations of laws of the United States, and as a law enforcement officer I am authorized to execute warrants issued under the authority of the United States.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE DEVICE TO BE EXAMINED

4.     The property to be searched is an Apple iPhone Model A1522 with IMEI 354390069331947, hereinafter the "Device."

5.     The Device is currently located at the U.S. Attorney's Office, 555 4th Street NW, Washington, D.C. 20530.

## PROBABLE CAUSE

6.     Leading up to Tuesday, January 16, 2018, a member of the Metropolitan Police Department-FBI ("MPD-FBI") Child Exploitation Task Force was acting in an undercover (UC) capacity. In that capacity, the UC posted a message on a fetish website for classified advertisements in a group called, "Taboo sluts," which read, "Single taboo dad with daughter. looking to meet other dads/moms to discuss very dark taboo secrets. PM me".[1]

---

[1]     "PM" stands for "private message". All text abbreviations and typographical errors in quoted chat language reflect the original.

7.      Between Tuesday, January 16, and Monday, January 22, 2018, the UC had the following chat conversation on that fetish website with a user using the name, "VenysDaDoll", later identified as RODNEY LEVON DAVIS (DAVIS), born in 1992:

DAVIS:      id love to hear your dark secret fntasies single dad

UC:      very dark taboo dad/dau- no limits… you?

DAVIS:      I'm into almost Anything aside from pain and permanent marks want to be Marks on me***  I'd love to hear your very dark taboo… I'm wet just imagining what it could be… how old is your dau?? I'd be open to babysitting if u need that service sometime….

UC:      Hi my daughter is 8 :) be hot for you to babysit for sure.

DAVIS:      Sounds like a plan!! When are you thinking?? What does she like to do for fun? I'm open to discussing in person if you would like to meet.

UC:      yes , we can do that for sure , don't want to get kicked out of here lol. what is your KIK?

DAVIS:      Understood. Me either Where do u work? What u doin for lunch today? I don't have Kik Hun. Can text or email tho..?

UC:      [provides his cell number]

DAVIS:      Just texted u boo.

8.      On Monday, January 22, 2018, at approximately 11:17 a.m., DAVIS texted the UC from the cell number, 240-704-7404, writing "Hey hun, its Venys" from the fetish website. The number 240-704-7404 was subsequently identified as a number associated with Google Voice, a telephony service provided by Google Inc. that provides, voice calling, text messaging, and other communication services.

9.      During the course of the chat, the UC advised DAVIS that he was sexually active with his purported 8-year-old daughter. DAVIS advised that he would "be open to babysitting

3

sometime". DAVIS asked the UC about the sexual activities that he engaged in with his daughter, including who would typically initiate the sexual contact, asking, "So does she initiate things hear days or do you? Like if I came over and we are all hanging around how would it get started up". The UC stated that he typically initiated contact and that it would be necessary to build trust first, to which DAVIS responded, "Okay, I'm open to even us meeting first..or even just interacting but not playing.. but I'll let u run the playbook considering it has to be when she's ready". DAVIS asked the UC specific questions about what sexual acts the UC's daughter had engaged, including whether he had penetrated his daughter, and how he initiated sexual contact, asking "what do u say when you want her to suck daddy's lollipop?"

10.     DAVIS proceeded to ask the UC, "Do you fuck her throat? She have a gag reflex?". Later in the text, DAVIS stated that he would "love to see her gag on my bbc". The UC understands bbc to mean, big black cock.

11.     Later in the chat, DAVIS asked the UC what his daughter looked like. The UC sent an image of his purported daughter to DAVIS. The picture depicted a prepubescent child wearing a blue shirt. DAVIS responded, "Such a cutie. She looks like she could use some attention from a black dick tonight".

12.     DAVIS and the UC agreed to meet in person later that evening near the UC's purported apartment in Washington, D.C. DAVIS stated that he worked in Washington, D.C. but would have to go home to Maryland and get his car and come back.

13.     As the chat proceeded, DAVIS stated that he would "even have her taste this booty maybe" and again asked the UC what specific words he used with the child to initiate the sexual activity, stating "You gotta tell me what words u usually use with her…". DAVIS asked

4

the UC whether he penetrated the child's anus. The UC stated that he had not, to which DAVIS responded, "Mmmm I should while she is suckin my dick. Just put the head in". DAVIS also expressed his desire to sexually abuse the 8-year-old child simultaneously with the UC:

DAVIS:      U into both of us playing with her simultaneously right?

UC:         Yes both playing with her at same time

DAVIS:      Okay perfect I love group like that

UC:         Sweet!

DAVIS:      Be back in an hour So we on for tonight?

UC:         Yes, are you sure you are cool with her age and all don't want u to freak out and make things uncomfortable?

UC:         ?

DAVIS:      No I'm totally cool

14.     DAVIS then confirmed with the UC that he would meet with DAVIS at 7:30 p.m. that evening. DAVIS again asked about how specifically he should talk about sexual acts with the 8-year-old child, stating, "Only question I Have is what language do you normally use with her when talking about stuff just so I can be consistent… do you use the words cock or dick or pussy or anything or what?" DAVIS also asked for the child's name.

15.     As the meeting time approached, DAVIS continued to text the UC with updates on his estimated time of arrival. DAVIS asked the UC, "Did u mention me to her? What have u said?" The UC stated that his daughter was excited and that it had been some time since the last time she had participated in something like this. DAVIS responded, "So I take it she really enjoyed it last time? Do you call it play time?"

16.     DAVIS proceeded to describe his nervousness and excitement:

DAVIS:      why were you nervous last time, but not this time?

UC:         I'm a little nervous now lol a good nervous though

DAVIS:      What about u?

DAVIS:      Lol ohh okay and I'm nervous that you're a cop lmao

UC:         Hahaha no far from that

DAVIS:      But I'm also excited because if this works out this could be a really good
            arrangement

DAVIS:      Haha okay. Good

UC:         Yes I want it to be like that, what u looking forward to doing the most
            with her

DAVIS:      Hmmm i'd have to say falling in love a little, just seeing her face when it
            may hurt some but knowing she's being a good girl

UC:         Yes!!! That's going to be so hot can't wait to see. So just one thing if it's
            to painful I can't have u go rough with her maybe just the head or more in.
            Cool?

DAVIS:      Yes that's fine, but we should aim for more each time we meet

17.     DAVIS advised that he was looking for parking and asked once again to cover the

specific parameters of the sexual contact he could engage in with the 8 year old:

DAVIS:      Ok, I think we're on the same page… Any more ground rules you want to
cover?

UC:         No I think that is it u said u were clean so I'm cool with her sucking your
            dick and putting a little in her if it doesn't hurt to bad, I have lube at the
            house

DAVIS:      Okay perfect.. can I cum in her in either place?

6

UC:          Yes I'm fine with that

18.     DAVIS then advised that he was arriving at the prearranged location in Washington, D.C.

19.     At approximately 8:00 p.m. on January 22, 2018, DAVIS met the UC at the prearranged location. The UC was sitting at the bar when DAVIS approached him. The UC stated, "Vaughn?", (the name DAVIS had given the UC earlier in the text conversation), and DAVIS stated yes. The UC shook DAVIS' hand and stated, "Man I'm a little nervous, let me use the restroom real quick and we can walk back to my place and meet her." DAVIS stated, "Ok." The UC made a signal to the arrest team and DAVIS was placed under arrest based on the probable cause belief that DAVIS had violated Title 18 United States Code, Section 2423(b), Travel in Interstate Commerce for the Purpose of Unlawful Sexual Activity.

20.     A search of DAVIS incident to arrest yielded condoms and personal lubricant. This search also yielded one cellular telephone in his possession, subsequently identified as the Device. Based on DAVIS' text communications with the UC just prior to arriving at the prearranged meeting location in Washington, D.C., the FBI believes DAVIS used the Device to communicate with the UC, and the Device will contain incriminating evidence, fruits, or contraband related to the suspected offense, including but not limited to the text message conversations outlined in this search warrant.

21.     The Device is currently in the lawful possession of the FBI and located in the cell phone forensics laboratory at the U.S. Attorney's Office at 555 4th Street NW, Washington, D.C. 20530.  The Device came into the FBI's possession in the following way: the FBI arrested

DAVIS on January 22, 2018 in Washington, D.C. based on the probable cause belief that DAVIS had violated Title 18 United States Code, Section 2423(b), Travel in Interstate Commerce for the Purpose of Unlawful Sexual Activity. Pursuant to a search incident to the arrest of DAVIS, the FBI seized a cellular telephone in DAVIS' possession, subsequently identified as the Device. The FBI seized the Device and transported it, along with DAVIS, to the FBI's Washington Field Office located at 601 4th Street, Washington, D.C. 20535. Based on my training and experience, and Device has been stored in a manner in which its contents are, to the extent material to this investigation, in substantially the same state as they were when the Device first came into the possession of the FBI.

22.     On January 24, 2018, your affiant applied for a search warrant to search the electronic contents of the Device. The probable cause section of the supporting affidavit misidentified the original posting to which the defendant responded and contained small typographical errors. This affidavit corrects those errors. It is in all other respects identical to the affidavit the Court relied on in issuing the search warrant for the Device.

23.     Following the issuance of the search warrant, the Device was transferred to an investigator with the U.S. Attorney's Office, who began the process of extracting its electronic contents. Neither the investigator nor any law enforcement member has reviewed the electronic contents of the Device. Through this search warrant, the government seeks authority to complete the processing of the Device and review its electronic contents in a manner consistent with this affidavit and the attachments hereto.

**TECHNICAL TERMS**

24.     Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.      "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks.  When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and other digital devices.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

b.      A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System (generally abbreviated "GPS") to display its current location, and often retains records of its historical locations.  Some GPS navigation devices can give a user driving or walking directions to another location, and may contain records of the addresses

9

or locations involved in such historical navigation.  The GPS consists of 24 NAVSTAR satellites

orbiting the Earth.  Each satellite contains an extremely accurate clock.  Each satellite repeatedly

transmits by radio a mathematical representation of the current time, combined with a special

sequence of numbers.  These signals are sent by radio, using specifications that are publicly

available.  A GPS antenna on Earth can receive those signals.  When a GPS antenna receives

signals from at least four satellites, a computer connected to that antenna can mathematically

calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

25.     Based on my training, experience, and research, I know that the Device has

capabilities that allow it to serve as a wireless telephone, digital camera, portable media player,

and GPS navigation device.  In my training and experience, examining data stored on devices of

this type can uncover, among other things, evidence that reveals or suggests who possessed or

used the device, and sometimes by implication who did not, as well as evidence relating to the

commission of the offense under investigation.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

26.     As described above and in Attachment B, this application seeks permission to

search for information that might be found within the Device.  Based on my knowledge, training,

and experience, as well as information related to me by agents and others involved in this

investigation and in the forensic examination of digital devices, I respectfully submit that there is

probable cause to believe that the records and information described in Attachment B will be

stored in the Device for at least the following reasons:

a.     Individuals who engage in criminal activity, including travel in interstate

commerce for the purpose of unlawful sexual activity in violation of Title 18 U.S.C. 2423(b), use

wireless telephones, like the Device, to access websites to facilitate illegal activity and to communicate with co-conspirators online; and to store documents and records relating to their illegal activity, which can include logs of online "chats" with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages; and to store contact information of co-conspirators, including telephone numbers, email addresses, and/or identifiers for instant messaging and social medial accounts. As stated previously, DAVIS communicated with the UC via a website and text messages to meet each other and arrange interstate travel for the purpose of engaging in unlawful sexual activity with the UC's purported eight year old daughter.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily-available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not

allocated to an active file or that is unused after a file has been allocated to a set block of storage

space – for long periods of time before they are overwritten.  In addition, a digital device's

operating system may also keep a record of deleted data in a "swap" or "recovery" file.

Similarly, files that have been viewed via the Internet are automatically downloaded into a

temporary Internet directory or "cache."  The browser typically maintains a fixed amount of

electronic storage medium space devoted to these files, and the files are only overwritten as they

are replaced with more recently viewed Internet pages.  Thus, the ability to retrieve "residue" of

an electronic file from a digital device depends less on when the file was downloaded or viewed

than on a particular user's operating system, storage capacity, and computer, smart phone, or

other digital device habits.

   27.  As further described in Attachment B, this application seeks permission to locate

not only electronic evidence or information that might serve as direct evidence of the crimes

described in this affidavit, but also for forensic electronic evidence or information that

establishes how the digital device(s) were used, the purpose of their use, who used them (or did

not), and when.  Based on my knowledge, training, and experience, as well as information

related to me by agents and others involved in this investigation and in the forensic examination

of digital devices, I respectfully submit there is probable cause to believe that this forensic

electronic evidence and information will be in the Device at issue here because:

    a.  Although some of the records called for by this warrant might be found in the

form of user-generated documents or records (such as word processing, picture, movie, or texting

files), digital devices can contain other forms of electronic evidence as well.  In particular,

records of how a digital device has been used, what it has been used for, who has used it, and

who has been responsible for creating or maintaining records, documents, programs,

applications, and materials contained on the digital device(s) are, as described further in the

attachments, called for by this warrant.  Those records will not always be found in digital data

that is neatly segregable from the hard drive, flash drive, memory card, or other electronic

storage media image as a whole.  Digital data stored in the Device(s), not currently associated

with any file, can provide evidence of a file that was once on the storage medium but has since

been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted

from a word processing file).  Virtual memory paging systems can leave digital data on a hard

drive that show what tasks and processes on a digital device were recently used.  Web browsers,

e-mail programs, and chat programs often store configuration data on a hard drive, flash drive,

memory card, or memory chip that can reveal information such as online nicknames and

passwords.  Operating systems can record additional data, such as the attachment of peripherals,

the attachment of USB flash storage devices, and the times a computer, smart phone, or other

digital device was in use.  Computer, smart phone, and other digital device file systems can

record data about the dates files were created and the sequence in which they were created.  This

data can be evidence of a crime, indicate the identity of the user of the digital device, or point

toward the existence of evidence in other locations.  Recovery of this data requires specialized

tools and a controlled laboratory environment, and also can require substantial time.

    b.    Forensic evidence on a digital device can also indicate who has used or

controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of

occupancy" while executing a search warrant at a residence.  For example, registry information,

configuration files, user profiles, e-mail, e-mail address books, "chat," instant messaging logs,

photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

c.     A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.     Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

f.     I know that when an individual uses a digital device to communicate to arrange interstate travel for the purpose of unlawful sexual activity with a minor, the individual's device will generally serve both as an instrumentality for committing the crime, and also as a

14

storage medium for evidence of the crime.  The digital device is an instrumentality of the crime

because it is used as a means of committing the criminal offense.  The digital device is also

likely to be a storage medium for evidence of crime.  From my training and experience, I believe

that a digital device used to commit a crime of this type may contain data that is evidence of how

the digital device was used; data that was sent or received; notes as to how the criminal conduct

was achieved; records of Internet discussions about the crime; and other records that indicate the

nature of the offense and the identities of those perpetrating it.

## METHODS TO BE USED TO SEARCH DIGITAL DEVICES

28.     Based on my knowledge, training, and experience, as well as information related

to me by agents and others involved in this investigation and in the forensic examination of

digital devices, I know that:

a.     Searching digital devices can be an extremely technical process, often

requiring specific expertise, specialized equipment, and substantial amounts of time, in part

because there are so many types of digital devices and software programs in use today.  Digital

devices – whether, for example, desktop computers, mobile devices, or portable storage devices

– may be customized with a vast array of software applications, each generating a particular form

of information or records and each often requiring unique forensic tools, techniques, and

expertise.  As a result, it may be necessary to consult with specially trained personnel who have

specific expertise in the types of digital devices, operating systems, or software applications that

are being searched, and to obtain specialized hardware and software solutions to meet the needs

of a particular forensic analysis.

b.     Digital data is particularly vulnerable to inadvertent or intentional modification or destruction.  Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data.  Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time.  As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c.     Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of particular data on a digital device.  For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device.  Evidence of the absence of particular data or software on a digital device is not segregable from the digital device itself.  Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment, and can require substantial time.

d.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions.  For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text.  Digital device users can also attempt to conceal data by using encryption, which

means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

e.      Analyzing the contents of mobile devices, including wireless telephones, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before

17

examination of the device.  Additionally, most smart phones and other mobile devices require

passwords for access.  For example, even older iPhone 4 models, running IOS 7, deployed a type

of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating

system and application data, which could only be bypassed with a numeric passcode.  Newer cell

phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering

most smart phones inaccessible without highly sophisticated forensic tools and techniques, or

assistance from the phone manufacturer.  Mobile devices used by individuals engaged in

criminal activity are often further protected and encrypted by one or more third party

applications, of which there are many.  For example, one such mobile application, "Hide It Pro,"

disguises itself as an audio application, allows users to hide pictures and documents, and offers

the same sophisticated AES-256 encryption for all data stored within the database in the mobile

device.

    f. Based on all of the foregoing, I respectfully submit that searching any digital

device for the information, records, or evidence pursuant to this warrant may require a wide

array of electronic data analysis techniques and may take weeks or months to complete.  Any

pre-defined search protocol would only inevitably result in over- or under-inclusive searches,

and misdirected time and effort, as forensic examiners encounter technological and user-created

challenges, content, and software applications that cannot be anticipated in advance of the

forensic examination of the devices.  In light of these difficulties, your affiant requests

permission to use whatever data analysis techniques reasonably appear to be necessary to locate

and retrieve digital information, records, or evidence within the scope of this warrant.

g.    In searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1.    The digital devices, and/or any digital images thereof created by law enforcement in aid of the examination and review, will be examined and reviewed by law enforcement personnel, sometimes with the aid of a technical expert, in an appropriate setting, in order to extract and seize the information, records, or evidence described in Attachment B.

2.    The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant.  Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.    In searching the digital devices, the forensic examiners may examine as much of the contents of the devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B.  In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described

19

in Attachment B.  Any search techniques or protocols used in searching the contents of the

digital devices will be specifically chosen to identify the specific items to be seized under this

warrant.

### AUTHORIZATION TO SEARCH AT ANY TIME OF THE DAY OR NIGHT

29.     Because forensic examiners will be conducting their search of the digital devices

in a law enforcement setting over a potentially prolonged period of time, I respectfully submit

good cause has been shown, and therefore request authority, to conduct the search at any time of

the day or night.

## **CONCLUSION**

30.     I respectfully submit that this affidavit supports probable cause for a warrant to search the digital device described in Attachment A and to seize the items described in Attachment B.


Respectfully submitted,


_____

Danielle K. Schnur
Special Agent
FBI


Subscribed and sworn to before me
on January 25, 2018:

_____

HONORABLE DEBORAH A. ROBINSON
UNITED STATES MAGISTRATE JUDGE